**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Walker Bennett MONROE,
Defendant–Appellant.**

No. 89–50597.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 14, 1991.

Decided Aug. 21, 1991.

---

John J. Cleary, Cleary & Sevilla, San Diego, Cal., for defendant-appellant.

Edward P. Allard, III, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before FERGUSON, CYNTHIA HOLCOMB HALL and RYMER, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Walker Bennett Monroe appeals his conviction following a jury trial on a variety of charges stemming from his participation in a conspiracy to import a multi-ton shipment of marijuana.[1] The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## I

On October 28, 1988, Monroe and Michael McCabe were charged by a federal grand jury in the Southern District of California in a nine-count indictment stemming from their involvement in a conspiracy to import marijuana from Thailand to the United States.

### A

The conspiracy began in mid–1987, when McCabe and Daniel Bender first discussed plans to smuggle as much as fifteen tons of marijuana from Thailand to the United States by sailboat. They were later joined by David Cunnison. Throughout the fall and winter, the three men continued to lay plans for this smuggling venture.

Unfortunately for his coconspirators, Bender was arrested by federal agents on unrelated drug charges in February 1988, and agreed to cooperate with the government. From that point on in the conspiracy he acted as a confidential government informant. Much of the evidence at Monroe's trial came from Bender's direct testimony and tapes of his monitored conversations with Monroe and McCabe.

---

1. Monroe was found guilty of conspiracy to import marijuana, in violation of 21 U.S.C. §§ 952, 960 & 963; conspiracy to travel in aid of racketeering and launder monetary instruments, in violation of 18 U.S.C. §§ 1952(a)(3), 1956(a)(2)(A) & 371; traveling in aid of racke- teering, in violation of 18 U.S.C. §§ 1952(a)(3) & 2; laundering monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A) & 2; and the unlawful use of a communication facility, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2.

Monroe was brought into the conspiracy in March 1988 to handle the shipping of the marijuana, since he purportedly had access to a ship. He soon reported that the ship was unavailable because it was under surveillance by law enforcement agencies. Two alternate plans were then discussed. Monroe proposed to ship the marijuana in sea containers, first to Mexico, and then by truck to the United States. He was to put up the money for the container shipment of marijuana and would assume responsibility for arranging safe passage through Mexico, where he claimed to have substantial influence with government officials. He would then arrange to have the marijuana shipped by truck to the United States. Monroe was said to be "gung ho" about the container venture and pressed McCabe and Bender to go along with it. Although McCabe and Bender wanted to ship the marijuana by sailboats directly to the United States, because there was enough marijuana for both plans, they agreed to the container venture while also pursuing plans to smuggle the marijuana by sailboat.

## B

In late March 1988, McCabe and Bender had a number of discussions about how they would transfer the funds needed to buy the marijuana. At the government's behest, Bender volunteered the services of a "friend" who was in the money exchange business. The "friend," of course, was the Drug Enforcement Administration (DEA). On March 31, McCabe and Bender agreed to have Bender's "friend" "send" $50,000 from San Diego to Hong Kong as a test-run. On April 11, McCabe gave Bender $50,000 cash and made arrangements to pick up the money in Hong Kong a few days later from "Tony," Bender's Asian contact, who was in fact DEA Special Agent Morgan. Bender gave the $50,000 to the DEA.

On April 18, McCabe and Agent Morgan met in Hong Kong and withdrew $50,000 from a Hong Kong bank. On April 25, McCabe and Morgan again met in Hong Kong to discuss the pending transfer of $700,000 which Monroe was to give Bender

in San Diego. Morgan told McCabe that the $50,000 had been wire transferred and that McCabe and the other coconspirators would be charged a commission for the transfer. McCabe agreed that the $700,000 would also be wired transferred to Morgan, who would hold it in his Hong Kong bank until McCabe needed it. On May 9 in San Diego, Monroe gave Bender two suitcases containing approximately $695,000 in small bills to be transferred to McCabe. Bender turned the money over to the DEA. On May 27, McCabe met with Morgan in Hong Kong and withdrew $50,000 from McCabe's bank. At some point after May 31, Morgan was ordered not to release any more money to McCabe.

## C

McCabe remained in the Far East until late June, making arrangements to purchase the marijuana. Monroe, meanwhile, had been arranging for its transportation through Mexico.

In early May, Monroe and Bender met to discuss the progress of the conspiracy. Their conversation was monitored by government agents. Monroe told Bender that plans were proceeding to smuggle marijuana both by container and by sailboat. Under his Mexican plan, the marijuana container would be off-loaded in Mexico and trucked directly to the United States, where an associate of his in Indiana would distribute it. Monroe claimed to have connections that would assure its safe passage through Mexican and United States customs. The Indiana distribution plans came as a surprise to Bender, who had expected that the marijuana would be shipped directly to Southern California. It was at that meeting that Monroe gave Bender the $695,000 to be sent to McCabe in Hong Kong. He also stated that he would be sending to McCabe the addresses in Mexico where the containers should be sent.

On June 29, 1988, Bender telephoned McCabe in Hong Kong. This conversation was also monitored. McCabe told Bender, "The marijuana made it from the field to a secure place where it is now being stored, waiting to be put on the container." He

also indicated that once he received the rest of Monroe's money from Morgan he would get the container "on the water right away." In a conversation monitored by the government on July 8, 1988, McCabe told Bender that "everything was fine" and "moving right along" with the container venture. McCabe and Bender met on July 13, 1988. Their conversation was again monitored. McCabe told Bender that Monroe was having difficulty with his original plan to ship the marijuana to Mazatlan, Mexico because his customs contact was not available, but that he was working on an alternate plan. He also indicated that Monroe had convinced his Mexican connections to invest in a second container. McCabe stated that he was planning to go back to Hong Kong in the near future and that except for the details of where the containers would be sent, the plan was otherwise ready to be implemented.

During the rest of July and August, there was no activity. McCabe sought Bender's help in contacting Morgan, but Bender, following DEA instructions, kept putting him off. McCabe and Monroe were arrested on September 8, 1988.

### D

After their arraignment, both defendants appeared before Judge Brewster, who held a pretrial hearing on April 14, 1989. On April 18, Monroe's case was transferred to Judge Keep for jury trial. The trial lasted twelve days and concluded in a guilty verdict on all eight counts. Monroe received a sentence of approximately fourteen and one-half years.

McCabe negotiated a plea agreement with the government. Under the terms of that agreement he was sentenced by Judge

Brewster for approximately three years for unlawful use of a communication facility, and was given a suspended sentence of seven years for conspiracy to import marijuana.

Monroe timely appealed.

### II

Two of Monroe's allegations of error involve Bender's testimony.

### A

Pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government provided Monroe with investigative reports involving illegal activities Bender had engaged in and for which he had been granted immunity from prosecution. The government withheld, however, the names of certain confidential informants identified in the reports. During cross-examination, Monroe sought to impeach Bender with these reports. He then moved to compel the government to disclose the names of the confidential informants so that they could be called during his case-in-chief. He sought to offer their testimony on the following grounds: (1) as prior inconsistent statements to impeach; (2) as evidence of bias; and (3) as negative character witnesses on the issue of Bender's character for truthfulness and veracity. The district court denied his motion, finding the testimony inadmissible and cumulative.

■ Monroe argues that the denial of his motion was a violation of his rights under *Brady* and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).[2] We affirm the district court's ruling.

We also reject his related claim that his rights under *Brady* were violated by the government's failure to turn over evidence prior to trial that might have been used to impeach his codefendant, McCabe, and at sentencing relevant to McCabe's role in the alleged conspiracy. "While the prosecution must disclose any [*Brady*] information within the possession or control of law enforcement personnel, it has no duty to volunteer information that it does not possess or of which it is unaware." *United States v.*

2. We reject Monroe's claim that the district court improperly denied the motion as untimely. The only motion deemed as untimely was Monroe's separate *Giglio* motion for in camera review of the government's reports to determine whether they contained *Brady* material relevant to Bender's credibility. R.T. 5/1/89 at 18–19. This motion was made after Bender had been cross-examined, and the district court rightly characterized it as untimely. The court nevertheless reviewed the reports for their possible *Giglio* value. *Id.*

■ In general, a district court's ruling on the prosecution's duty to produce evidence under *Brady* is reviewed de novo. *See, e.g., United States v. Pisello,* 877 F.2d 762, 764 (9th Cir.1989); *United States v. Lehman,* 792 F.2d 899, 901 (9th Cir.), *cert. denied,* 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986). When, however, a district court rules on whether a defendant should have access to particular information in a government document that has been produced pursuant to *Brady,* we review for clear error. *See United States v. Strifler,* 851 F.2d 1197, 1201–02 (9th Cir. 1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989).[3]

■ The district court ruled that Bender's prior inconsistent statements could not be introduced for impeachment purposes since they had not been given under oath pursuant to Fed.R.Evid. 801(d)(1)(A). R.T. 5/1/89 at 13; R.T. 5/2/89 (a.m.) at 2–3. This ruling was clearly erroneous. " 'A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness.' " *United States v. McLaughlin,* 663 F.2d 949, 952 (9th Cir.1981) (quoting *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975)). "The prior statements may have been oral and unsworn, and 'the making of the previous statements may be drawn out on cross-examination of the witness himself, or if on cross-examination the witness has denied making the statement, or has failed to remember it, the making of the statement may be proved by another witness.' " *United States v. Sisto,* 534 F.2d 616, 622 (5th Cir.1976) (citation omitted).

■ The error was harmless, however, since the court ruled in the alternative that the witnesses Monroe wished to call could not offer admissible testimony about Bender's prior inconsistent statements; rather, their testimony involved Bender's conduct. R.T. 5/2/89 at 9. The court properly found that this was inadmissible impeachment evidence. *See* Fed.R.Evid. 613 advisory committee's note (rule allowing for impeachment by prior inconsistent statements does not apply to impeachment by evidence of prior inconsistent conduct).

Monroe's second ground for admission was that the testimony of the confidential informants was relevant to establish Bender's bias. Specifically, Monroe sought to "show that Bender systematically dissembled to the government agents during the course of the debriefing and during the trial in this case in order to minimize his own criminal liability so as to obtain the rewards of a cooperation agreeement [sic]." C.R. 98 at 8.

■ The district court concluded that because Bender had been granted immunity from prosecution for his prior criminal conduct he had no incentive to minimize his previous criminal acts; if anything, he had an incentive to exaggerate them. R.T. 5/2/89 at 6–8. This finding is clearly supported by the record. Bender's plea agreement contemplated that he would be given immunity "for any offenses [he] committed which were [then] known by the government." R.T. 4/20/89 at 72. Moreover, the jury had ample evidence of the details of Bender's plea agreement to assess his bias. *See United States v. Roberts,* 783 F.2d 767, 770 (9th Cir.1985) (test of whether a district court improperly limited a defendant's abili-

---

*Hsieh Hui Mei Chen,* 754 F.2d 817, 824 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). *Brady* does not require the government to create exculpatory evidence that does not exist. *United States v. Sukumolachan,* 610 F.2d 685, 687 (9th Cir.1980). Here, there was none. Monroe has not identified *any* information withheld by the government. In fact, his reply brief concedes that evidence to impeach McCabe might not even exist.

**3.** We recognize that in cases involving the disclosure of an informant's identity, in which the government's qualified right to protect the iden-

tity of its informants is implicated, *see Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), we have employed an abuse of discretion standard, *see United States v. Sai Keung Wong,* 886 F.2d 252, 255 (9th Cir.1989); *cf. United States v. Phillips,* 854 F.2d 273, 277 (7th Cir.1988) (district court's conclusion that confidential informant files did not contain *Brady* material reviewed for abuse of discretion). We need not decide whether this more deferential standard of review should apply in this case, since under either standard we would affirm the district court's ruling.

ty to present evidence of bias is whether the jury had sufficient information to assess the witness's bias even without the excluded information); *accord United States v. Jones,* 766 F.2d 412, 414 (9th Cir.1985).

■ Monroe's third ground for admission was to establish Bender's character for untruthfulness under Fed.R.Evid. 608. The district court properly ruled that evidence of Bender's character for veracity would be cumulative and irrelevant, since his character for untruthfulness was "not disputed," particularly given Bender's own statements attesting to the fact "that he was a liar and a criminal for a significant portion of his adult life." R.T. 5/2/89 at 5–6. To the extent that Monroe sought testimony about specific incidents, such testimony was properly barred as an impermissible attack on Bender's credibility under Fed.R.Evid. 608(b). *See United States v. Bosley,* 615 F.2d 1274, 1276 (9th Cir.1980).

### B

Monroe alleges that the government impermissibly vouched for Bender by introducing through Bender's testimony on direct examination, the "truthful testimony" requirement of his plea agreement.[4]

■ The government may not vouch for the credibility of its witnesses by presenting the jury with personal assurances of the witness's veracity. *United States v. Simtob,* 901 F.2d 799, 805 (9th Cir.1990); *United States v. Kats,* 871 F.2d 105, 107 (9th Cir.1989) (per curiam); *United States v. Roberts,* 618 F.2d 530, 533 (9th Cir.1980). However, a reference to the "truthful testimony" provisions of a witness's agreement with the government does not constitute vouching if it is made in response to an attack on the witness's credibility because of his plea bargain. *Kats,* 871 F.2d at 107 (citing *United States v. Shaw,* 829 F.2d 714, 716 (9th Cir.1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988)); *United States v. Dadanian,* 818 F.2d 1443, 1445 (9th Cir. 1987), *rev'd on reh'g on other grounds,* 856 F.2d 1391 (1988).

The government argues that its colloquy with Bender was not vouching because it was offered in response to Monroe's attack in his opening statement on Bender's credibility.[5] Monroe effectively concedes that

---

4. *The government engaged in the following colloquy with Bender:*

   Q Now you also understand, Mr. Bender, and it was expressed to you and to the court, that as a part of your plea agreement, that you shall truthfully disclose all of the information with respect to the activities of yourself and others, concerning all matters about which the United States Attorneys office inquires of you?
   A That's correct.
   Q That you shall truthfully testify before the Grand Jury, and any trial or other court proceeding with respect to any matters about which the United States Attorneys office may request your testimony.
   A That's correct.
   Q And that as a further condition, you may not commit—you must not commit any future crimes.
   A That's correct.
   Q You also understand that as a part of your plea agreements that should you commit any further crimes, or give any false, incomplete—
   MR. IREDALE: With respect to this, your Honor, I'm going to object on the grounds of vouching.
   THE COURT: Sustained.
   R.T. 4/20/89 at 73–74.

5. The government also argues that its reference to the "truthful testimony" requirements of a cooperation agreement does not, of itself, constitute vouching. It relies on *Dadanian,* where this circuit held that the admission of a "truthful testimony" clause did not constitute vouching "where the agreement was relevant to material facts at issue and the party to the agreement was subject to cross examination as to his motives." 818 F.2d at 1445. Later Ninth Circuit decisions have, however, without citing *Dadanian,* analyzed the introduction of "truthful testimony" clauses in the same manner as any other form of vouching. *See United States v. Lew,* 875 F.2d 219, 223 (9th Cir.1989); *Kats,* 871 F.2d at 107; *United States v. Wallace,* 848 F.2d 1464 (9th Cir.1988); *Shaw,* 829 F.2d at 716–717. In *Wallace,* the panel implicitly rejected *Dadanian's* reasoning, noting that although a witness's testimony regarding the truthfulness clause did not directly " 'portray [the government] as a guarantor of truthfulness' as directly as statements by the prosecutor himself," they leave an implication "that the prosecutor can verify the witness's testimony and thereby enforce the truthfulness condition of its plea agreement." 848 F.2d at 1473 (quoting *Roberts,* 618 F.2d at 537). Thus, contrary to the government's argument, we must consider whether its reference to

his opening statement contained an attack on Bender's credibility,[6] but argues that the Ninth Circuit has established a "bright line" rule requiring that a prosecutor "avoid[ ] vouching or at least wait[ ] until re-direct examination."

We disagree. It is true that in most cases involving retaliatory vouching the vouching came after the witness's credibility had been attacked on cross-examination. *See Kats*, 871 F.2d at 107 (after cross-examination); *United States v. Rohrer*, 708 F.2d 429, 432–33 (9th Cir.1983) (vouching "only after appellants' extensive impeachment of Green's motives on cross-examination and their discussion of part of the agreement"); *United States v. Brooklier*, 685 F.2d 1208, 1218–19 (9th Cir.1982) (rebuttal following defendant's case), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); *United States v. Tham*, 665 F.2d 855, 862 (9th Cir.1981) (rebuttal following defense's closing argument attacking witness's credibility), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 466 (1982). There is, however, no bright-line rule. In *Shaw*, we simply stated the rule as follows: "We have made it clear that references to requirements of truthfulness in plea bargains do not constitute vouching when the references are in response to attacks on the witness' credibility because of his plea bargain." *Shaw*,

829 F.2d at 716. Here, the reference to the agreement came only after Bender's credibility clearly had been attacked by Monroe in his opening statement. Under those circumstances, it was Monroe who created the risk that the government's reference to the truthful testimony requirement "will be interpreted as an attempt to establish truthfulness and suggest verifiability." *Id.* at 717.

We conclude that because the government introduced the "truthful testimony" aspects of Bender's plea agreement only after Monroe had attacked Bender's credibility, it did not vouch for its witness.[7]

### III

Monroe challenges his convictions under Counts Two, Five, and Six, which allege that by participating in the attempted wire transfer of funds from San Diego to Hong Kong, he violated 18 U.S.C. § 1956(a)(2)(A) by "knowingly and intentionally transport[ing] and attempt[ing] to transport monetary instruments and funds ... from a place in the United States to and through a place outside the United States." He challenges both the applicability of the statute to his conduct and the sufficiency of the evidence supporting his conviction.

■ The interpretation of a statute is a question of law which is reviewed de novo.

---

the "truthful testimony" requirement of Bender's plea agreement constitutes vouching.

6. During his opening statement, Monroe's counsel described Bender's credibility as one of the two major issues the jury would have to decide. R.T. 4/19/89 at 85. A good portion of the opening statement is devoted to Bender, his criminal past, and the nature of his plea bargain, including allegations that Bender was paid for his testimony. Among the numerous direct attacks on Bender's credibility is the following:

> ... The case is a complete mess. Everybody in this case is a liar. Bender lied to the agents. Michael McCabe lied to Bender. Cunnison lied to Bender. Bender lied to Walker Monroe, and to McCabe. The agent in Hong Kong lied to McCabe. McCabe lied to Bender about the agent.
>
> ....
>
> And the evidence will show that Bender, the man who will be the Government's chief witness, and upon whom the government's case rests, was the biggest liar of all. It will show

that he lied to the agents, he lied to McCabe, he lied to Cunnison, he lied to Walker Monroe, he lied to Debbie Kagle (phonetic), Michael McCabe's girlfriend, he lied by omission, he lied by deletion, he lied with intelligence, but most of all, he lied, and *I believe he will lie*, with style.

R.T. 4/19/89 at 60–61 (emphasis added).

7. Any vouching that occurred was, in any event, harmless beyond a reasonable doubt. *See United States v. Browne*, 829 F.2d 760, 766 (9th Cir.1987), *cert. denied*, 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988). The prosecutor's reference to Bender's agreement was brief and nonrecurring. It was cured by the court's instruction that the jury should scrutinize the testimony of an "informer" or "immunized witness" with greater caution than that of an ordinary witness. *See Simtob*, 901 F.2d at 806; *Kats*, 871 F.2d at 107; *Shaw*, 829 F.2d at 718; *Brooklier*, 685 F.2d at 1218–19; *Tham*, 665 F.2d at 862.

*Callejas v. McMahon,* 750 F.2d 729, 730 (9th Cir.1984). As to Monroe's sufficiency argument, there is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Marabelles,* 724 F.2d 1374, 1377 (9th Cir.1984).

### A

At the time of Monroe's indictment, § 1956(a)(2) provided in part,

> (2) Whoever *transports* or attempts to transport a *monetary instrument* or *funds* from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
>> (A) with the intent to promote the carrying on of specified unlawful activity; ...
>>
>> ....
>>
>> shall be sentenced to a fine of $500,000 or twice the value of the monetary instrument or funds involved in the transportation, whichever is greater, or imprisonment for not more than twenty years, or both.

Pub.L. No. 99–570, § 1351, 100 Stat. 3207, 3207–18 (1987) (emphasis added). The statute was amended in 1988 to apply to the actual or attempted "transport[ation], transmi[ssion], or transfer[ence]" of monetary instruments or funds. Pub.L. No. 100–690, § 6471(b), 102 Stat. 4378 (1988).

"Transport" is not defined in the statute. Monroe argues that given the ordinary meaning of the term, to "carry" or "convey" from one place to another, Congress intended § 1956(a)(2) to apply only to the physical transportation of funds across the United States border. *See* Strafer, *Money Laundering: The Crime of the '90's,* 27 Am.Crim.L.Rev. 149, 163–4 n. 86 (1989) (cit-

ing numerous dictionary definitions in support of this argument).

We believe, however, that where money is concerned, a contemporary meaning of "transport" would have to include a wire transfer, since funds are increasingly "conveyed" electronically. The Second, Third, and Eleventh Circuits reached this conclusion in interpreting the meaning of "transport" in 18 U.S.C. § 2314. Section 2314, at the time it was considered by those courts, prohibited an individual from "transport[ing] in interstate or foreign commerce ... money ... knowing the same to have been stolen...." 18 U.S.C. § 2314 (1982). Finding that wire transfers were clearly covered by the statute, the Second Circuit stated,

> The question whether the section covers electronic transfers of funds appears to be one of first impression, but we do not regard it as a difficult one. *Electronic signals in this context are the means by which funds are transported.* The beginning of the transaction is money in one account and the ending is money in another. The manner in which the funds were moved does not affect the ability to obtain tangible paper dollars or a bank check from the receiving account.

*United States v. Gilboe,* 684 F.2d 235, 238 (2d Cir.1982) (emphasis added), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983); *see also United States v. Goldberg,* 830 F.2d 459, 467 (3d Cir.1987) ("It is a fact of life in today's highly computerized and technological society that transfers of money between accounts are generally accomplished electronically."); *accord United States v. Wright,* 791 F.2d 133, 136 (10th Cir.1986). We adopt the reasoning of these courts in analyzing § 1956, and conclude that an international wire transfer constitutes the "transport[ation]" of "funds" for purposes of subsection (a)(2).[8]

---

8. This interpretation is also necessary to avoid rendering a portion of subsection (a)(2) mere surplusage. *See United States v. Merhrmanesh,* 689 F.2d 822, 829 (9th Cir.1982) (courts "may not construe a statute so as to make any part of it mere surplusage"). Subsection (a)(2) pre-

cludes the transportation of both "funds" and "monetary instruments" In § 1956(c)(5), Congress provided an exhaustive definition of "monetary instruments" which includes cash, checks, and other tangible instruments—in short, everything that one can *physically* carry.

■ In construing the statute, the district court considered the 1988 amendment, finding that it was intended to clarify Congressional intent that "transport" include a "transfer" or "transmission" of funds. A subsequent amendment to a statute "may serve to clarify, rather than change, the existing law." *Callejas*, 750 F.2d at 731 (citation and quotation omitted). That amendment and its legislative history, though not controlling, are entitled to substantial weight in construing the earlier law. *In re Adams*, 761 F.2d 1422, 1426 (9th Cir.1987); *May Department Stores Co. v. Smith*, 572 F.2d 1275, 1278 (8th Cir.) (per curiam), *cert. denied*, 439 U.S. 837, 99 S.Ct. 122, 58 L.Ed.2d 134 (1978).

The legislative history of the 1988 amendment makes clear that Congress intended to clarify pre-existing law. Section 6471 of the Anti–Drug Abuse Act of 1988 explicitly states

> Section 6471(b) would clarify that the term "transports" in the money laundering statute was intended [to] include electronic and other forms of movement of funds other than physical transportation.

134 Cong.Rec. S17367 (daily ed. Nov. 10, 1988) (section-by-section analysis of Anti–Drug Abuse Act).[9]

Given the contemporary meaning of "transportation" of funds and the clear declaration of Congressional intent in the 1988 amendment, the district court properly found that § 1956(a)(2) applied to wire transfers. Contrary to Monroe's contention, there was no ex post facto violation. *See United States v. Tapert*, 625 F.2d 111, 120–21 (6th Cir.) (applying subsequent amendment to affirm felony conviction),

---

"Funds" must therefore have an independent significance. As Congress recognized in § 1956(c)(4), "funds" may be moved by "wire or other means." It follows that the "transport[ation]" of "funds" for purposes of subsection (a)(2) would include a wire transfer.

9. Congressional intent to clarify, rather than change the statute is amplified by the fact that Congress, in § 7057(a) of the Act, made an identical amendment to 18 U.S.C. § 2314 to codify the *Gilboe, Wright,* and *Goldberg* decisions. The legislative history of that amendment states:

> Section 7057(a) is designed to codify appellate court holdings that 18 U.S.C. 2314 is not limited to the physical transportation of stolen or

*cert. denied*, 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980)).

## B

Monroe argues that even if a wire transfer constitutes a violation of § 1956(a)(2), there was insufficient evidence to establish that he and his coconspirators attempted to do so.

The indictment charged that Monroe and his coconspirators conspired to transport or attempt to transport funds from the United States to Hong Kong (Count Two) and that they attempted two such transportations: $50,000 on April 11 (Count Five) and approximately $695,000 on May 9 (Count Six).

Monroe denies that he and his coconspirators attempted to transfer funds by wire. He claims that they instead agreed to what he calls a "money exchange," where payment of funds in San Diego would create a credit in Hong Kong that could be contractually enforced.

While there was some discussion of a non-wire-transfer exchange, there is ample evidence of an attempt to transfer funds by wire. This includes the March 31 McCabe–Bender agreement to "send" funds and McCabe's April 25 discussion with Morgan in which McCabe was told that the $50,000 had been wire transferred, that Morgan would charge a "service charge," and in which McCabe agreed that the second payment would likewise be wire transferred.

## IV

Monroe alleges a number of errors at sentencing. We find no merit in any of his contentions.

---

fraudulently acquired money or property but also extends to the situation in which such proceeds are transmitted or transferred electronically in interstate or foreign commerce.... [T]hree courts of appeal have recently rejected contentions that section 2314 is limited—because of the use of the verb transports—to instances of physical asportation of money. [citations omitted]. No contrary ruling exists. Nevertheless, in order to clarify the statute and avoid future litigation, it seems appropriate to add verbs—"transmits" and "transfers"—that clearly reach acts of electronic movement of money.

134 Cong.Rec. S17370 (daily ed. Nov. 10, 1988).

## A

He first argues that the district court erred in refusing to depart downwardly from the sentencing guidelines to equalize his sentence with McCabe's.[10] He claims that under 18 U.S.C. § 3553(a)(6),[11] the court was obligated to sentence Monroe so as to avoid a disparity with the sentence given McCabe since, according to Monroe, McCabe was "similarly situated defendant."

■ Monroe's argument fails on several grounds. First, McCabe and Monroe were not "similarly situated," as they were not found guilty of the same offenses. Monroe was convicted on eight counts relating to the drug operation, *see supra* note 1, whereas McCabe was convicted on only two counts, the unlawful use of a communication facility and conspiracy to import marijuana. Judge Keep was therefore justified in refusing to consider the circumstances of McCabe's conviction. *See United States v. Changa*, 901 F.2d 741, 744 (9th Cir.1990) (trial judge justified in treating codefendants differently because they were convicted of different crimes); *United States v. Rios*, 893 F.2d 479, 481 (2d Cir. 1990) ("The guideline level granted a codefendant in entirely different circumstances is irrelevant in determining appellant's guideline level."); *United States v. Sanchez–Solis*, 882 F.2d 693, 699 (2d Cir. 1989) (rejecting argument that § 3553(a)(6) bars sentencing disparity between codefendant who pleaded guilty and codefendant who stood trial).

■ Second, our cases suggest that the desire to equalize sentences may be an impermissible basis for departure. *See United States v. Ray*, 930 F.2d 1368, 1372 n. 7 (9th Cir.) (desire to equalize punishment among codefendants who are all sentenced under the Guidelines is an impermis-

sible concern), *cert. denied,* —— U.S. ——, 111 S.Ct. 1084, 112 L.Ed.2d 1189 (1991); *United States v. Carpenter*, 914 F.2d 1131, 1135–36 (9th Cir.1990) (rejecting the principle that the Guidelines require equal sentences); *United States v. Enriquez–Munoz*, 906 F.2d 1356, 1258–60 (9th Cir.1990) (suggesting that the Guidelines do not permit upward departure for purposes of equalizing sentences among codefendants). Judge Keep properly declined to "look behind [McCabe's] plea agreement[ ] and assess the actual culpability of the defendants." *Enriquez–Munoz,* 906 F.2d at 1359.

■ Finally, since McCabe was sentenced before a different judge, Judge Keep had no obligation to consider the facts of McCabe's sentencing. As the Tenth Circuit observed in a similar situation in which a defendant complained of a lesser sentence given a coconspirator by a different judge,

> We are loathe to conclude the district court violated the law in imposing a sentence upon Richardson within the appropriate guideline range where the lighter sentences of his coconspirators either arise out of a different court or from different laws.

*United States v. Richardson*, 901 F.2d 867, 869 (10th Cir.1990). We agree with the reasoning of the Tenth Circuit and consequently find no error in the court's refusal to equalize sentences.

## B

Monroe argues that under *United States v. Capriola*, 537 F.2d 319 (9th Cir.1976), a remand is necessary to assure that he was not penalized for exercising his constitutional right to a jury trial.

In *Capriola*, we held that where a disparity in sentences given codefendants sug-

---

10. While we lack jurisdiction to hear an appeal from a district court's discretionary decision to depart downward from the guidelines, *United States v. Morales*, 898 F.2d 99, 101 (9th Cir. 1990), where, as here, the district court indicated that it lacked the power to depart, an appeal may be had, *id.* at 102 n. 2.

11. The court, in determining the particular sentence to be imposed, shall consider—

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a)(6) (1988).

gests that a defendant who pleaded not guilty was being penalized for exercising his constitutional right to a trial, the reasons for the disparity must appear in the record. *Id.* at 321. Where the record is devoid of reasons to support the disparity, a remand is necessary to permit the trial judge to either ameliorate the sentences or explain the disparity. *Id.*

We have since limited *Capriola* to situations in which the defendant's constitutional right to stand trial is implicated. *United States v. Citro,* 842 F.2d 1149, 1154 (9th Cir.1988), *cert. denied,* 488 U.S. 866, 109 S.Ct. 170, 102 L.Ed.2d 140 (1988); *United States v. Endicott,* 803 F.2d 506, 510 (9th Cir.1986); *United States v. Hall,* 778 F.2d 1427, 1429 (9th Cir.1985). "In the absence of such infringement, the *Capriola* holding need not be applied mechanically to all cases in which defendants are sentenced differently." *Hall,* 778 F.2d at 1429.

*Capriola*'s requirement that a judge account for sentencing disparities has been limited further by the advent of the Sentencing Guidelines. Indeed, it may have been obviated by them. Since the Sentencing Reform Act requires a district court to consider the defendant's individual characteristics and circumstances, *see* 18 U.S.C. § 3553(a), and to provide a statement of reasons for imposing a particular sentence, *see id.* § 3553(c), we may presume that a sentence was calculated as the Guidelines require and not in retaliation for the defendant's decision to exercise his constitutional right to stand trial. *Accord Citro,* 842 F.2d at 1153–54 (*Capriola* applicable only where record devoid of reasons to support

sentencing disparity); *Hall,* 778 F.2d at 1429 (same).

■ As Monroe was sentenced pursuant to the Guidelines and the record states clearly the reasons given for his sentence, we conclude that *Capriola* is inapplicable.

## C

Monroe argues that the district court erred in refusing to depart downwardly from the applicable guideline range under § 2D1.4(a) because it erroneously concluded that he and his coconspirators were "reasonably capable" of producing the six tons of marijuana anticipated by the conspiracy.[12] At the time of his sentencing § 2D1.4(a) provided,

> **Attempts and Conspiracies**
>
> (a) Base Offense Level: If a defendant is convicted of participating in an incomplete conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

United States Sentencing Commission, *Guidelines Manual,* § 2D1.4(a) (Oct. 15, 1988). The commentary to the guideline provided in part,

> [w]here the defendant was *not reasonably capable of producing* the negotiated amount the court may depart and impose a sentence lower than the sentence that would otherwise result.

U.S.S.G. § 2D1.4(a) comment. (n. 1) (emphasis added).[13] Whether a defendant was "reasonably capable of producing the nego-

---

**12.** He also claims that because the conspiracy was "government controlled" it could not have succeeded. He further argues that § 2D1.4 is inapplicable to "Government controlled and dominated conspirac[ies]." We decline to reach either argument, since Monroe raises both arguments for the first time on appeal. *See United States v. Smith,* 905 F.2d 1296, 1302 (9th Cir. 1990).

**13.** We generally apply the version of the Guidelines in effect at the time of sentencing. *United States v. Carvajal,* 905 F.2d 1292, 1294 (9th Cir.1990); 18 U.S.C. § 3553(a)(4). The guideline and related commentary were amended November 1, 1989. U.S.S.G.App. C, ¶ 136–138

(Nov. 1, 1989). While the guideline was not substantively amended, the commentary now provides in relevant part,

> [W]here the court finds that the defendant did not *intend to produce* and was not *reasonably capable of producing* the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

*Id.* § 2D1.4(a) comment. (n. 1) (emphasis added). We need not decide whether it is appropriate to apply the commentary in effect at the time of Monroe's sentencing or the 1989 version, since Monroe's conduct satisfies both versions.

tiated amount" of drugs in an incomplete drug conspiracy is a factual determination which we review for clear error. *United States v. Upshaw*, 918 F.2d 789, 791 (9th Cir.1990); *United States v. Rodriguez*, 896 F.2d 1031, 1033 (6th Cir.1990).

At sentencing, Monroe contended that the conspiracy was a failure. He emphasized that as late as July, there were serious problems with his Mexican connections and that McCabe had been unable to obtain passage on an ocean carrier for the containers. After late July, there was "no discussion whatsoever about doing this deal." Given these logistical difficulties and the absence of any further planning, he argued that a downward departure was appropriate since the conspiracy was unlikely to succeed.

■ The district court properly emphasized that under the guideline commentary, the relevant consideration was not probable success but whether the conspiracy was capable of producing the amount in question. Its refusal to grant a downward departure rested on the following facts. First, Monroe had supplied McCabe with nearly $700,000, an amount sufficient to buy six tons of marijuana. Second, in late June and again in mid-July, the conspirators indicated that the marijuana purchase had been arranged and that they intended to proceed with their plan. Although, as Monroe argues, there was no further discussion of the conspiracy, Judge Keep noted that at no point after July did any member of the conspiracy indicate that it should be aborted. Since the marijuana was "in place," had been funded, and the conspirators did not evidence any intention of calling off their plan despite logistical problems, she concluded that they were "reasonably capable" of delivering six tons.

These findings are clearly supported by the record. Since Monroe and his conspirators evidenced an intention and an ability to deliver six tons of marijuana, we reject Monroe's contention that the court erred in concluding that they were reasonably capable of producing that amount.

### D

■ Monroe argues that the district court erred in increasing his base offense level under the guidelines for his role as an "organizer, manager, or supervisor" pursuant to § 3B1.1(c).[14] A district court's finding that a defendant is an organizer, leader, manager, or supervisor of the criminal activity is a question of fact which is reviewed for clear error. *United States v. Sanchez*, 908 F.2d 1443, 1449 (9th Cir. 1990).

There is ample evidence in the record to support the district court's finding that Monroe was an organizer or leader. The fact that Bender and McCabe played a leadership role in the initial phases of the conspiracy is not dispositive. The guidelines commentary notes that there can be more than one leader or organizer. U.S.S.G. § 3B1.1 comment. (n. 3). Monroe played a decisive role in the decision to ship the marijuana through Mexico, rather than directly to the United States. It was he who had connections with Mexican customs officials and underworld figures who would assure transportation to the United States. He exercised decisionmaking authority as to the logistics of the shipments to Mexico and distribution in the United States. Where, as here, a defendant exercises decisionmaking authority and an organizational role, an upward adjustment under § 3B1.1 is appropriate. *See Sanchez*, 908 F.2d at 1448 (defendant supervised attempt to ship drugs across United States border and ex-

---

**14.** That section provides in part:
 Based on the defendant's role in the offense, increase the offense level as follows:
 . . . .
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 U.S.S.G. § 3B1.1. Among the factors relevant to making this determination are: (1) the exercise

of decisionmaking authority; (2) the nature of the participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5); the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *Id.*, comment. (n. 3).

ercised decisionmaking authority); *U.S. v. Avila*, 905 F.2d 295 at 298–99 (9th Cir.1990) (defendant's coordination of procurement and distribution of drugs supported sentencing enhancement for leadership role).

## V

For the foregoing reasons, we AFFIRM, in all respects, Monroe's conviction and sentence.