**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Hector Manuel BRUMEL–ALVAREZ,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Efren MENDEZ–DUENAS,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mario VARGAS–BRUUN,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jorge CARRANZA–PENICHE,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Rolando Antonio AYALA–JUSTINIANO,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jorge ROMAN–SALAS, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Pablo GIRON–ORTIZ, Defendant–
Appellant.**

Nos. 89–50412, 89–50415, 89–50423,
89–50426, 89–50431, 89–50479,
89–50480.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 1991.

Decided Sept. 29, 1992.

As Amended on Denial of Rehearing and
Rehearing En Banc April 22, 1993.

under the old.' " *Miller,* 482 U.S. at 432, 107 S.Ct. at 2452 (quoting *Dobbert v. Florida,* 432 U.S. 282, 300, 97 S.Ct. 2290, 2301, 53 L.Ed.2d 344 (1977)).

Michael L. Crowley, San Diego, CA, for defendant-appellant Brumel–Alvarez.

Barbara L. Davis, San Diego, CA, for defendant-appellant Mendez–Duenas.

Gerald T. McFadden, Solana Beach, CA, for defendant-appellant Vargas–Bruun.

Carolyn Chapman, San Diego, CA, for defendant-appellant Carranza–Peniche.

Cynthia G. Aaron and Ezekiel E. Cortez, Aaron & Cortez, San Diego, CA, for defendant-appellant Ayala–Justiniano.

Rene Sotorrio, Coconut Grove, FL, for defendant-appellant Roman–Salas.

Elizabeth A. Barranco, El Cajon, CA, for defendant-appellant Giron–Ortiz.

Stephen G. Nelson, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: POOLE, KOZINSKI, and LEAVY, Circuit Judges.

## ORDER AMENDING OPINION AND DENYING PETITION FOR REHEARING

The opinion filed on September 29, 1992, is amended as follows:

[Editor's Note: Amendments have been incorporated within published opinion.]

Judges Kozinski and Leavy have voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc. Judge Poole has voted to grant the petition for rehearing and to accept the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc, and no judge of the court requested a vote on the suggestion for rehearing en banc. Fed. R.App.P. 35(b).

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

## OPINION

LEAVY, Circuit Judge:

This criminal action involved the government's contention that the defendants were engaged in an international high level drug trafficking conspiracy in Bolivia and Mexico. The conspiracy was uncovered as part of a "sting" operation of the Drug Enforcement Agency (DEA) and the U.S. Customs. The seven defendants, whose appeals are consolidated,[1] are Mexican and Bolivian citizens who were arrested and charged by the United States Government with a host of conspiracies involving controlled substances[2] and the use of a communications facility to facilitate the commission of a controlled substance offense. The superseding indictment that was handed down in the United States District Court for the Southern District of California contained twenty-one separate counts.

In opening remarks at the trial, the government stated:

For the next month or so, you are going to hear a story about a search, a search that is going to take us on a five-thousand mile journey, a search, a journey from the cliffs of La Jolla, to the jungles of Bolivia; and the search, ladies and gentlemen, is for one thing: cocaine.

. . . .

This journey involves a plan that had one objective, one mission. That was to find the mother lode of cocaine in Bolivia, the source. This is a journey to the source, the source for the cocaine.

Reporter's Transcript (RT) II at 148–49.

Despite this statement, no drugs were ever recovered in Bolivia and none were introduced into evidence at trial. No one testified that any drugs were ever recovered in the possession of any of the defendants. Only one person tied the defendants to cocaine and cocaine laboratories discovered in the Bolivian jungle region known as the Beni. That person was a government informant by the name of David Wheeler. Wheeler was unescorted by any government undercover agent when he went to Bolivia.

Wheeler first came to the attention of the authorities in August of 1986 when he was arrested and charged in Oklahoma for possession of one kilogram of cocaine. Wheeler pleaded guilty. While incarcerated, Wheeler told the arresting agents that he was interested in cooperating with the government. He also wrote several letters soliciting contact with the government.

In January of 1987, as a result of Wheeler's solicitations, U.S. Customs Agent Joe Robles met with Wheeler and debriefed him. Wheeler claimed he could lead Customs to high level Mexican government officials who were trafficking drugs into the United States. Wheeler claimed, from his many years of illegal drug dealing in Mexico, to know either Mexican government officials or people who were connected with them. Wheeler was released on bond and allowed to make telephone contact with certain individuals in Mexico. Ultimately, this led to the government's sting

---

1. The consolidated cases are: *United States v. Brumel–Alvarez,* No. 89–50412, *United States v. Mendez–Duenas,* No. 89–50415, *United States v. Vargas–Bruun,* No. 89–50423, *United States v. Carranza–Peniche,* No. 89–50426, *United States v. Roman–Salas,* No. 89–50479, *United States v. Giron–Ortiz,* No. 89–50480, and *United States v. Ayala–Justiniano,* No. 89–50431.

2. The conspiracies charged were: conspiracy to import a controlled substance in violation of 21 U.S.C. §§ 952, 960, and 963; conspiracy to possess a controlled substance with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846; and conspiracy to travel in foreign commerce to promote an unlawful activity in violation of 18 U.S.C. §§ 1952(a)(3) and 371.

operation and the arrest and trial of the defendants.

At trial, the government maintained that the Bolivian defendants, Ayala, Vargas–Bruun, and Roman–Salas, represented a Bolivian drug cartel that produced massive amounts of cocaine. RT II at 162. The government said it would prove that Giron, Brumel, and Carranza, the Mexican defendants, were necessary players in the drug operation, *id.*, because they allegedly arranged for protection for the airplane that would carry the cocaine from Bolivia when it made a refueling stop in Mexico. The government stated it would prove that these defendants were policemen or members of the military in Mexico with high level connections. RT II at 163–64. The government also stated:

> The government will prove that Hector Brumel and Jorge Carranza, because of their association and their position in Mexico, were able to ... provide the security [for the airplane][.] And the government will prove that Pablo Giron, Hector Brumel and Jorge Carranza ... associated themselves with, or secured the patronage of General Poblano Silva, who is responsible, at the time, for the military sector, similar to a state, south of Mexico City, the military sector or zone called Puebla.
>
> The government will prove that Poblano Silva assigned to that association of people, a man named Lieutenant Colonel de la Vega. Number Two in command.
>
> With the assurance of General Silva and Lieutenant Colonel de la Vega, ladies and gentlemen, Louis [the main undercover operative who was posing as a member of the Mafia] was going to get the protection he sought.

RT II at 164–65.

The trial lasted from January 5, 1989, until April 26, 1989. On May 25, 1989, the jury returned its verdict of guilty for all defendants on each count except one, which the government dismissed.

On appeal, the defendants argue that material information bearing on the credibility of David Wheeler was withheld from them in violation of *Brady v. Maryland,*

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the Jencks Act, 18 U.S.C. § 3500. We reverse and remand for a new trial.

## DISCUSSION

### Standard of Review

We have not employed a single standard of review where there have been challenges to a conviction based on a *Brady* violation. At various times our review has been *de novo. See United States v. Lehman,* 792 F.2d 899, 901 (9th Cir.), *cert. denied,* 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986); *United States v. Kennedy,* 890 F.2d 1056, 1058 (9th Cir.1989), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990); *United States v. Pisello,* 877 F.2d 762, 764 (9th Cir.1989); *accord United States v. Monroe,* 943 F.2d 1007, 1012 (9th Cir.1991) ("In general, a district court's ruling on the prosecution's duty to produce evidence under *Brady* is reviewed de novo."). At other times we have reviewed for clear error, *see United States v. Strifler,* 851 F.2d 1197, 1201–02 (9th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989), and explained that this standard is appropriate where some, but not all, of a document has been produced. *United States v. Monroe,* 943 F.2d 1007, 1012 (9th Cir.1991). Our opinion in *Monroe* also suggests that there might be occasions where review for an abuse of discretion would be appropriate. *Id.* at 1012 n. 3. We observe that other discovery-related decisions are reviewed under the abuse of discretion standard. *See United States v. Boshell,* 952 F.2d 1101, 1104 (9th Cir.1991) (denial of Jencks Act request); *United States v. Sanchez,* 908 F.2d 1443, 1451 (9th Cir.1990) (refusal to require disclosure of confidential informant's identity).

We need not decide which standard of review applies here. Given the facts of this case, under any standard we would conclude that the Levine Memorandum contains exculpatory material that must be released to the defendants.

A district court's denial of a motion to produce a witness' statement pursuant to the Jencks Act, 18 U.S.C. § 3500(b), is reviewed for an abuse of discretion. *United States v. Augenblick*, 393 U.S. 348, 355, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969). A conviction will be affirmed if the "Jencks error is more than likely harmless." *United States v. Wallace*, 848 F.2d 1464, 1470 (9th Cir.1988).

## I. The Levine Memorandum

The government's main witness was David Wheeler. In opening remarks, Assistant U.S. Attorney Stephen Nelson stated:

Now, ladies and gentlemen, David Wheeler is not the only witness in this case; but he is an important witness in that he, and the government will prove this, is the key to unlocking the door that led to the Mexicans and the Bolivians.

David Wheeler was a key, and that key had to be put in the lock and turned; and if the cuts on the key weren't right, the lock wouldn't open, so the agents tested them.

RT II at 160. David Wheeler was so central to the government's case at the end of the trial that the government argued in closing:

If David Wheeler never went to the stash, never saw the cocaine, never unwrapped the package and that's a figment of his imagination, then you, ladies and gentlemen, should acquit all of the Bolivian defendants and Mr. Mendez–Duenas also; but I do believe that—but I submit to you, the evidence is to the contrary.

RT XXXV at 5918.

David Wheeler had been involved in illegal drug operations for twenty-five years prior to his arrest in Oklahoma. He testified he very often lied and convinced individuals that he was someone he was not. He testified that he had worked as a screenwriter and had connections in Hollywood. The government portrayed Wheeler as someone who "had a very sordid past" yet could be believed in this case:

It's like a doctor who's convicted of a serious felony, and he goes to prison.... When he goes to prison, while in prison, he does research and solves the cancer riddle ... [i]s he a good man or a bad man? He's a man, ladies and gentlemen. He's a complex individual. At one time, he did good things. At one time, he did bad things.

You can't generalize. You have got to look at the man and the situation. That's what I am asking you to do here.

I am asking you to go beyond the name calling and the character assassination, and to zero in on David Wheeler[.]

RT XXXVII at 6255–56.

In final arguments, the government discredited the defendants' attempts to impugn Wheeler's credibility. The government argued:

David Wheeler agreed to put it on the line. He went undercover. He exposed himself to great danger. He went down into Mexico, with no backup, no gun, no radio. He went down to Bolivia, went out into the Beni, met Winston Rodriguez and Pato Pizarro, the defendants in this case.

He went out to see the labs and the cocaine. He was grilled by Pato Pizarro. He was grilled by Winston Rodriguez.

[I]f David Wheeler hasn't passed the test, David Wheeler would not have come back from Bolivia.

    . . . .

David Wheeler was like an astronaut. Floating, at the third space station. When he was in Bolivia, the only link he had was a commercial phone link with George Urquijo up in San Diego.

... David Wheeler was acutely aware of what he was looking at and the dangers involved. Is Dave Wheeler a saint? No. Is David Wheeler a choir boy? No. Is he going to get the Nobel Peace Prize? No. He assuredly is not.

You don't have to like David Wheeler; but, ladies and gentlemen, I suggest, when you look at all of the facts, his role in this case, you have to acknowledge that what he did took a lot of courage;

and no amount of name calling and character assassination can alter that fact. RT XXXVII at 6251-53.

On appeal, the defendants contend that the government withheld crucial information bearing on Wheeler's credibility. After the trial, the defendants became aware of a government memorandum written by Michael Levine (the "Levine Memorandum"), a retired Drug Enforcement Agency Group Supervisor and a witness for the government. That memorandum, which was directed to Special Agent James Collier of the Office of Professional Responsibility, was highly critical of Wheeler's integrity and role during the course of the undercover investigation.

Two months before trial the government moved, ex parte, for a protective order regarding the Levine Memorandum and related materials. The trial court reviewed the documents and agreed that the Levine Memorandum should be sealed. The defendants were given a six-page redacted version of the original forty-two page report.[3] Previously, they had been given a seven page report prepared by Levine on December 29, 1987, entitled "Undercover Negotiations for Attempted Purchase of 1,000 Kilograms of Cocaine," which was attached to the Levine Memorandum for the ex parte proceeding. The government contended at the proceeding that the forty-two page report was merely an "editorialized or amplified" version of the seven page report prepared on December 29, 1987.

After we heard oral argument in this appeal, the government released the entire Levine Memorandum and attachments to the defendants. We ordered supplemental briefing from the parties on what effect, if any, the withholding of this information had on the defense.

■■■ We conclude that the withholding of the Levine Memorandum and related documents violated the defendants' right to due process under the rule of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), which provides that exculpatory material in the government's possession must be released to criminal defendants.[4] Evidence impeaching the testimony of a government witness falls within the *Brady* rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). We also conclude that the withholding violated the Jencks Act, which entitles a defendant to access to government documents for assistance in cross-examination of witnesses in order to impeach for prior inconsistent statements.

## II. Analysis

Assistant U.S. Attorney Stephen G. Nelson, in an affidavit dated November 4, 1988, in support of the "Government's Motion For A Protective Order and Request for Ex Parte In Camera Review Of Certain Intra–Agency Confidential Reports And Statements Pursuant to Rule 16(d)(1), Federal Rules Of Criminal Procedure And Sealing Order Thereon," justified sealing the Levine Memorandum largely on grounds of irrelevancy:

> After reviewing the enclosed intra-agency confidential materials, it is the Gov-

---

**3.** The entire Levine Memorandum and attachments consists of: (1) the 42–page memorandum authored by Levine; (2) a seven-page DEA report dated December 29, 1987, by Levine entitled "Undercover Negotiations For Attempted Purchase of 1,000 Kilograms of Cocaine;" (3) a "DEA sensitive" memorandum from Levine to the Office of Professional Responsibility regarding David Wheeler's statements made in the presence of himself and Agent Robles about bribing DEA agents in Florida on January 9, 1988, and; (4) a two-page memorandum from DEA Agent Charles E. Hill to the Office of Professional Responsibility regarding Levine's report of Wheeler's allegations regarding brib-

ing DEA agents. Hill interviewed Wheeler in Robles' presence, and Wheeler recanted the statements he made about corrupt DEA agents in Florida. Attached to Hill's report is a four-page recantation signed by Wheeler.

**4.** The *Brady* rule is

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97.

ernment's position that as to the [material requested to be sealed], these reports or statements ... are not Jencks Act ... statements since they are not witness statements that relate to the subject matter of Agent Levine's direct testimony. Similarly, it is the Government's position that these materials do not fall within the definition or application of [*Brady*] or its progency inasmuch as *the materials consist primarily of the gratuitous opinions or comments of one individual agent* [i.e., Agent Levine], who for whatever reasons: 1) is highly critical of certain of his DEA and Customs colleagues whom he considers inept or incompetent; 2) does not like, believe or trust David Wheeler, the Customs informant; 3) feels the case was at least to some degree botched; and 4) is concerned about DEA being embarrassed or its image harmed because the informant became aware, during the course of the undercover operation, of DEA's institutional or personnel shortcomings. While Agent Levine's opinions, feelings, and conclusions might make for an interesting "insider's expose" on the Government's "WAR ON DRUGS" or a sensational-type newspaper article, it is respectfully submitted that [*Brady does not*] *require disclosure of such judgmental-type observations.*

(Emphasis added.)

Upon review, we conclude that the Levine Memorandum is more than simply an internal DEA memo and it is far from irrelevant. The memorandum contains a detailed and specific description of Wheeler's conduct during the course of the investigation, including his false claims to government agents about his high-level business and banking connections in the Cayman Islands; his formal recantation of statements he made to Customs and DEA agents about buying information from and bribing DEA agents in Florida; and his thwarting of an attempt to tape a telephone conversation with a Mexican general who allegedly was involved with the defendants in the drug operation. The memorandum also describes Wheeler's influence and control over the government investiga-

tion of this case. In Levine's words, from his memorandum:

> I noticed that when the Customs officers were talking about [Wheeler], it was almost as if they were in awe of him. They were eccstatic [sic] at the results of his cooperation to that point....
>
> ....
>
> [Customs undercover agent] Urquijo later confided in me that he often found himself pitted between his "bosses" (who preferred to follow Wheeler's suggestions) and me. He also stated that, with his experience in internal affairs, he was very "uncomfortable" with the latitude and freedom the informant had been given, but being a new agent in customs ... he had felt often "trapped" in his role.

Levine Memorandum at 2. Levine continued:

> [T]here was much uncotrolled [sic] telephone contact between WHEELER and the violators [some of the defendants]. He often, without consulting or coordinating with the DEA control agent ... or myself, would speak to the violators telling them, "Luis said ..." Thus utilizing my undercover identity to manipulate the case the way he (Wheeler) saw fit. Weeks later I had to overcome many statements he attributed to "Luis" (my undercover identity). He was constantly allowed to operate in this fashion *throughout the investigation* unless I was present. I made it clear, when I was present, that it was a drug case and that I was a DEA agent, and that it would be done my way—which Wheeler never ceased to fight against.

Levine Memorandum at 5 (emphasis added). Levine clarified that

> The points of the various arguments [with Wheeler] were usually not as important as the control they signified. The issue was that the CI [the confidential informant, Wheeler] was out of control, in that he believed himself on an equal par with the investigating agents. Being an "outsider" in a case that was

essentially the responsibility of San Diego DEA and Customs, I still did not think it my place to "rein him in."

Levine Memorandum at 8.[5]

At trial, the defendants presented the defense that they were not drug dealers, but that they had plotted a "reverse sting;" that is, that they planned to take the money but not supply the drugs (what the government refers to as the "we're not drug dealers we're thieves" defense). They presented evidence that they were not who they had represented themselves to be to the undercover agents; i.e., Mexican officials or members of the militia or police, and that they did not have high-level connections. In closing arguments, they maintained that Wheeler's testimony that they were in fact drug dealers was not believable and that the government should not have been taken in by his stories:

> During the whole time, showing the extent of the government's foolish, foolish, foolish and undoubtedly well-intentioned trust in this man, during the whole time he was on his own recognizance ... he's never supervised.... He was taken, at his word, by the government.
>
> . . . .
>
> [M]illions of dollars are talked about but not one speck of cocaine shows up at any time and not one sample is gathered by the government and nothing really is seen except, surprise, surprise, surprise, that which Mr. Wheeler says he saw....
>
> The Government, the individuals involved in this case, through their trust and through their misguided confidence [in Wheeler], ignored by choice or by lack of wisdom points throughout this whole investigation that if they had been reviewed under even the most glancing of

considerations would have revealed that this was all a scam.

RT XXXVI at 6015–17.

The defendants also made the following insightful arguments:

> What is incredible is that this man was essentially placed in charge of the investigation. We have ten, 15 agents milling around in the background, but the person who led this investigation throughout it was a convicted criminal who had not [had] verified any of the truths that supposedly he had told the government.

RT XXXVI at 6012.

> We have Mr. Wheeler, and unfortunately in this screenplay of a case Mr. Wheeler was producer, director, screenwriter and actor. Not one of the agents involved in this case really supervised what this man did.

RT XXXVI at 6055.

In rebuttal, Assistant U.S. Attorney Nelson argued the very issue whose evidence he withheld on the ground that it was irrelevant:

> Now, defense counsel would have you believe that, and somehow everything David Wheeler said was taken at face value. Not true. Agent Robles debriefed Wheeler for days. He became satisfied that David Wheeler knew what he was talking about....
>
> *Now, does that mean that Agent Robles set out an investigation where David Wheeler would have free rein or run the investigation as counsel said? Absolutely not.*
>
> That's why you have videotaped meetings. That's why you have audio taped meetings and telephone calls. That's why you have other agents usually present.
>
> That's why you have diagrams, maps, and photographs, and the other corroborative evidence.

---

**5.** As a further demonstration of Wheeler's influence during the investigation, Levine observed: In the San Diego Customs office [Wheeler] seemed to have the full run of the place, using telephones and desks at his will and was on a first name, "kidding" basis with many of the agents and secretaries. He was extremely familiar with those "controlling" him, often joking about matters private and personal to each. He in fact—while no violators were present—not only had the full run of the undercover house, but the keys to all the leased undercover cars, which he utilized at his whim.
Levine Memorandum at 4.

RT XXXVII at 6250–51 (emphasis added). Yet, by persuading the court to seal most of the Levine Memorandum on grounds that it was irrelevant, Nelson withheld the very evidence that would have contradicted his own argument.

### The *Brady* Violation

■ *Brady* information includes "material ... that bears on the credibility of a significant witness in the case." *United States v. Strifler,* 851 F.2d 1197, 1201 (9th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989). Under *Brady,* the prosecutor's withholding of evidence favorable to the accused violates due process where the evidence is material either to guilt or innocence. *United States v. Gordon,* 844 F.2d 1397, 1403 (9th Cir. 1988). Favorable evidence includes impeachment evidence. *Id.* at 1402.

■ To prove a *Brady* violation the defendant must show failure to disclose material evidence. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

■ There is no doubt the information in the Levine Memorandum is material. Faced with the evidence that Wheeler allegedly was running the investigation and was therefore in a position to manipulate Customs, the DEA, the defendants, and the evidence, the jury might well have thought the government's arguments incredible that Wheeler was reliable in this investigation. The jury might have focused more on the arguments that tended to show that Wheeler might have lied about what he saw in Bolivia and that he was able to locate the cocaine laboratories from a surveillance by a DEA aircraft the day before the raid with the Bolivian Leopardos. *See* RT XXXVI at 6053–54 ("Although it was unsaid by Mr. Wheeler, [that is the secret] why he was able to so easily and cavalierly and with no effort whatsoever to find [the cocaine laboratories], to find a speck of dust in a vastless jungle.").

That the verdict might have been different is especially true where the evidence showed that Wheeler alone thwarted the opportunity to tape a telephone call to a General Poblano Silva in Mexico, who the government maintained was responsible for the military sector called Puebla and would arrange protection for the cocaine shipment when the airplane refueled in Mexico. The defendants argued in closing:

> Agent Levine, as Luis ... orders Carranza to call the general. "I want to hear; I want to listen in on the other line. I want you to call the general. I want to hear that everything is okay between the two of you." Very specific.
>
> . . . .
>
> Call the general; and what happens? Although Mr. Carranza is specifically told to call the general, he calls somebody named Pablo Lopez, who nobody has ever heard of, remember, Levine said: "I have no idea who he was."
>
> And they say virtually nothing in this phone conversation; and then he gets off the phone and makes some excuse about not being able to call the barracks or the base or something; and everybody buys it.
>
> No one says, "wait a minute, we told you to call the general. Who's Pablo Lopez?" Nothing.
>
> They buy the Carranza calls, however.
>
> . . . .
>
> But the point is that Carranza was specifically told to call the general. He couldn't because there was no general to call.
>
> Nobody suspicious, nobody cares, ... but this fact is glossed over by the prosecution because it doesn't fit. It doesn't fit.
>
> Now, Mr. Nelson implies that the reason nobody met, saw, spoke with, or even received the written communication from the general, is because ... [t]his is his words, "[the General was able] to insulate himself so well in this case."
>
> . . . .
>
> There is not one iota of evidence, not one shred of evidence, that any general ever had anything to do with this case,

other than Carranza and Brumel's words [when they were engaged in the reverse "sting."]

RT XXXVII at 6202-04.

Had the defendants had the Levine Memorandum, however, they could have argued based on the following scenario:

> [D]uring this final undercover operation and the resultant arrests, he (Wheeler) was able to prevent the government from obtaining what may turn out to be one of the most important bits of evidence in the whole investigation.... It was known that Caranzas [sic] was working for a "General Silva," the man actually in charge of the zone in Mexico, where our contraband laden plane was due to land for refueling: however, we had no *direct* evidence connecting Silva to the conspiracy.
>
> ....
>
> On 1/7/88 in a meeting at San Diego Customs ... I suggested that a Title III be obtained for the undercover house, so that I might "manipulate" the Colonel [Carranza] into calling General Silva and we would have a recorded conversation of the General's voice.
>
> ....
>
> At approximately 11:30 [on January 13, 1988], in a hastily called meeting at the undercover house ... Wheeler tells me that the Colonel had called the General from Las Vegas to explain the delays and that the General had been livid and hung up on him after accusing him of stealing his money and burning him. Wheeler further stated that the Colonel had asked that he not tell Luis (me) about it.
>
> I thought the stage was now set perfectly for me to call an emergency meeting with the Mexicans and demand that the General be called. We had nothing to lose.... Wheeler was against this for various vague reasons, none of which made much sense. It seemed to me that for some unknown reason he simply did not want the U.S. Government to obtain a recorded conversation with this general. The argument went on for some time, exclusively between myself and the CI.
>
> Finally, ... I stepped out of my role of undercover and ordered Wheeler to contact the Mexicans and tell them "Luis wants an emergency meeting."
>
> Wheeler, when he saw he had no backing among the Customs agents, stated that *the only time you could get the General at home was at night.* I then told him to call the meeting for that evening then.
>
> ....
>
> At 4:pm, I received a call from S/A Doug Hebert telling me that there was not going to be a meeting; that the Mexicans wanted to go to Sea World and that Wheeler was taking them there, after which they would go to bed early and meet Luis in the morning. Hebert was unclear as to who had authorized the CI to do this. He stated that he was with Robles and that Robles had gotten a call and that "that was what the call was about." Hebert went on to state that we would have a better chance getting the General on the phone in the morning[.]
>
> I reminded Hebert that Wheeler had stated that the only time you could get the General at home was at night. I further told him that the CI had successfully blocked DEA from getting a recording of the General and that the CI was doing anything he wanted and was totally "uncontrolled."

Levine Memorandum at 28-29; 33-34.

We agree with the defendants that

> The information in the Levine Memorandum indicating that Wheeler deliberately thwarted Levine's attempt to tape record a telephone conversation with the General is critically important. The defense in this case maintained that defendants Carranza, Brumel and Giron's claims to be acting on behalf of Mexican Army General Poblano Silva were totally false, and that in fact, no one from the Mexican military had actually promised to provide protection. Wheeler's actions in deliberately acting contrary to Levine's instructions to bring the defendants to an undercover meeting so that a telephone call

to the General could be made give rise to the suspicion that Wheeler knew or suspected that there was no General to call. Supplemental Brief at 5. Yet, despite withholding the memorandum, Nelson argued in closing that "Jorge Carranza ... was needed and essential because he's your linkage to that airstrip and to Poblano Silva[.]" RT XXXV at 5875.

■ There is "a reasonable probability that the suppressed ... evidence affected the verdict," *United States v. Gillespie,* 852 F.2d 475, 481 (9th Cir.1988), in that "had [this] evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. Wheeler's credibility as a witness was an important issue in the case. Evidence that he lied during the investigation, that he had had an undue influence on the DEA and Customs agents involved in the investigation, or that he thwarted the opportunity to gather crucial evidence, would be relevant to his credibility and the jury was entitled to know of it. *See Giglio,* 405 U.S. at 154–55, 92 S.Ct. at 766.

Agent Robles might have been impeached with the memorandum as well. In response to the government's question, Agent Robles testified:

> Q. During the two-and-a-quarter years you have been working with David Wheeler in the conduct of this investigation, has he ever said or done anything that has caused you to change your opinion as to his reliability, truthfulness, and cooperation in this case?
>
> A. Not at all.

RT VI at 877.

The defendants argued in closing that Robles had been honestly mislead:

> Mr. Robles, as honest and as good a man as he may be, does not, maybe never had a point of reference or capacity to gauge whether Mr. Wheeler was telling the truth about anything.

RT XXXVI at 6005. The Levine Memorandum, however, reveals that Robles knew of Wheeler's false claims and his recantation of having bribed or bought off DEA agents in Miami: Robles was present during the interview where Wheeler recanted his statements about the bribes. Moreover, Robles knew that Wheeler had disobeyed a direct order by preventing Carranza's call to General Poblano Silva, because he was present at the meeting where Levine ordered that the call be placed, and Robles got and passed on to Special Agent Hebert the information that Wheeler was taking the Mexican defendants to Sea World instead. *See* Levine Memorandum at 33, 34.

■ We reject the government's argument that, because the defendants' collective defense refocused the inquiry to their state of mind and credibility instead of Wheeler's, the government's failure to provide the entire Levine Memorandum and its attachments obviates any *Brady* argument. We also reject the government's argument that the Levine Memorandum contained merely cumulative evidence. In truth, it contained evidence contradictory to the government's position. The jury, not the prosecutor, "has the duty to sift through the inconsistencies of testimony, to weigh the credibility of witnesses and to resolve any ambiguities in the evidence." *Saint Paul, Marine Transp. Corp. v. Cerro Sales Corp.,* 505 F.2d 1115, 1119 (9th Cir. 1974) (civil case). If provided with the Levine Memorandum and related documents, the defendants "might very well have chosen not to put on an affirmative defense at all, but rather, to rely on cross-examination of Agent Levine, David Wheeler, and other government witnesses to establish that Wheeler had lied about ... crucial aspects of this case." Appellants' Supplemental Brief at 14.

**The Jencks Act**

■ The withholding of the Levine Memorandum and its attachments also violates the Jencks Act. The Jencks Act requires the government to produce any written statements by a government witness that relate to the subject matter of any direct testimony by the witness. 18 U.S.C. § 3500(b). "The rationale of the Jencks Act is to provide the defense with material that could impeach a government witness."

*United States v. Polizzi,* 500 F.2d 856, 893 (9th Cir.1974).

■ The Jencks Act defines a statement as "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). The Levine Memorandum is clearly a "statement" within this definition. Levine felt so strongly about his perceptions of Wheeler and of the investigation in general that he prepared the memorandum and further, called U.S. Attorney Nelson to inform him about it some four months before trial. Nelson Affidavit, para. 4.

■ In his affidavit, Nelson stated that the Levine Memorandum was "not Jencks Act ... statements since they are not witness statements that relate to the subject matter of Agent Levine's direct testimony." We disagree. "The prosecution is obligated to disclose to the defense statements falling within the Jencks Act regardless of anyone's perception of the utility of the statements for impeachment." *Polizzi,* 500 F.2d at 893. Moreover, it is sufficient that, " '[i]n determining whether the statements in question 'related to' the direct testimony of the witness, it must relate *generally to the events and activities testified to.*' " *United States v. O'Brien,* 444 F.2d 1082, 1086 (7th Cir.1971) (quoted in *United States v. Derrick,* 507 F.2d 868, 871 (4th Cir.1974)).

■ The Levine Memorandum does relate "generally to the events and activities testified to." In direct examination, Agent Levine was asked questions about, and translated, certain taped meetings with the defendants that are referred to in the Levine Memorandum (and which were part of the redacted material released to the defendants). *See, e.g.,* RT VIII beginning at 1165 (the meeting with certain of the defendants on September 21, 1987, at the undercover house in La Jolla); RT XI beginning at 1879 (the trip to Panama and meeting with certain of the defendants starting on November 15, 1987). The meetings described in the Memorandum, however, are placed in the context of Levine's perception of the investigation, and Wheeler's role in

it, while in direct testimony, there is no such context.

On direct examination, the government elicited from Levine his expertise in "sensing" situations and people:

Q. (by Mr. Nelson):

During your 24 years as an undercover agent, have you carried yourself, and comported yourself, and conducted yourself in a way that is, to some degree, dependent upon how you sense or interpret the background circumstances or intentions of the people with whom you are dealing?

A. Yes.

. . . .

Q. And, in that role as an experienced undercover agent, you try, as best you can, to understand the thinking, as best you can, the thinking process of the other person so as to react in an appropriate manner?

. . . .

A. That's exactly what I am trying to do.

RT XI at 1931–32. Agent Levine's descriptions in the memorandum of Wheeler, Wheeler's role, and the undercover operation in general are presumably based on the same expertise he testified to on direct examination. Yet, when Levine was asked in cross-examination about the original report he had written, he obfuscated by stating "the [redacted version] is my original report, *less the items that didn't concern this case.*" RT VIII at 1262. The Levine Memorandum, therefore, could have been used to impeach Levine when the taped meetings were described as if they were nothing but an ordinary undercover investigation and "sting."

■ Wheeler's signed recantation of his allegations about corrupt DEA agents, attached to the Levine Memorandum, is also a "statement" within the meaning of the Jencks Act. Wheeler could have been impeached with his statement because he claimed to be telling the truth during the course of the investigation and trial.

Because we conclude that the withheld evidence could have affected the outcome of the trial, the Jencks error was not "more

than likely harmless." *Wallace*, 848 F.2d at 1470.

## CONCLUSION

There "is a reasonable probability that had the [Levine Memorandum and attachments] been disclosed, the result of the proceeding would have been different such that [our] confidence in the outcome is undermined." *United States v. Lai*, 944 F.2d 1434, 1440 (9th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 947, 117 L.Ed.2d 116 (1992).

REVERSED and REMANDED.

POOLE, Circuit Judge, dissenting:

I can hardly blame the government for wishing to keep the contents of the Levine Memorandum secret. Levine's chronicle of the investigation includes sensational details of interagency competition and incompetence. Levine was contemptuous of Wheeler and of the conduct of the investigation by the United States Customs Service, and freely criticized both. In addition, some of the most disconcerting portions of the memorandum recount what Levine described as "a nightmarish, failed, buy/bust operation in Panama during which DEA functioned at its absolute worst." According to Levine, government agents involved in the undercover operation in Panama "were too drunk to deal with on a logical basis," thereby jeopardizing not just the investigation, but perhaps also the lives of Levine and the others involved in the operation. Given the embarrassing nature of much of Levine's memorandum, it is little surprise that the government requested the district court to seal portions of it.

Unfortunately the sealed portions of the Levine Memorandum, in addition to lambasting the handling of the investigation, contained some information which could fairly be characterized as material evidence favorable to the defendants. I agree with the majority that the memorandum should have been produced under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). I cannot agree, however, that withholding the sealed portions of the memorandum constituted prejudicial and hence reversible error.

The majority first argues that the defendants were prejudiced by not having access to Levine's suspicions that Wheeler had lied about matters collateral to the investigation, such as "high-level business and banking connections in the Cayman Islands," and allegations of DEA corruption in Florida. Majority Opinion at 1459. I do not believe that the failure to disclose the memorandum would constitute error on these grounds, since the information would not have been admissible for the purpose of attacking Wheeler's credibility. The Federal Rules of Evidence bar the use of "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility." Fed.R.Evid. 608(b); *see also United States v. Bosley*, 615 F.2d 1274, 1276 (9th Cir.1980) ("[S]pecific instances of conduct of a witness not resulting in a criminal conviction may not be proved by extrinsic evidence solely for the purpose of attacking the credibility of the witness.").

At best, the defense could have asked Wheeler about his Cayman Island and DEA corruption claims on cross-examination, but such inquiries would have done little to add to the already impressive quantity and quality of impeaching evidence elicited from Wheeler. Indeed, Wheeler's untruthfulness was undisputed. In addition to all the other damning activities Wheeler confessed to on direct- and cross-examination, he readily admitted to being a liar:

Q. So you lied about your name often, as part of your career and profession as a criminal?

A. That's true.

Q. You very often successfully lied and convinced individuals that you were somebody that you were not; am I correct?

A. Yes, that's true.

Q. As a matter of fact, being a drug dealer, one of the things that you have to have to be a successful drug dealer, as you were for some years, is the ability to lie convincingly; isn't that true?

A. I wouldn't—okay, yes, sure.

Q. And you in fact, you know that you know how to lie convincingly?

A. Yes.

Q. You proved it to yourself over and over again over your 25 years as a criminal; isn't that true?

A. Yes.

Transcript of Proceedings from January 10, 1989 at 426–427. The Levine Memorandum, in comparison to such damning admissions, is relatively innocuous, for it merely recites Levine's unsubstantiated suspicions that Wheeler was hyperbolizing his importance and experience in matters unrelated to the subject of the investigation. These suspicions, taken in the context of Levine's undisguised disdain for Wheeler, add little to the vast quantity of impeaching evidence elicited from Wheeler himself. The jury chose to credit Wheeler's testimony despite his admission on the witness stand that he was a proficient prevaricator. I thus find it improbable that they would have disbelieved him had they known that he had perhaps aggrandized his role in unrelated events. For the same reason, I find it improbable that the jury would have been impressed by Wheeler's "recantation" of his accusations about DEA corruption. I read Wheeler's statement as moderating, not recanting, his allegations that a DEA Agent had accepted bribes in Florida at some time in the distant past. But even accepting the majority's characterization of Levine's sworn statement, I doubt that the jury would have attached much significance to the fact that Wheeler had made untrue accusations of DEA corruption given that they credited his testimony in spite of his long history of crime and deceit.

For similar reasons I find unpersuasive the majority's contention that the Memorandum would have been useful in impeaching Agent Levine. The majority invents a contradiction between Levine's testimony and the Memorandum by asserting that Levine's testimony described the covert operations "as if they were nothing but an ordinary undercover investigation and 'sting.'" Majority Opinion at 1464. The majority therefore concludes that the Memorandum would have been useful for impeaching Levine. Majority Opinion at

1464. In fact, contrary to the majority's assertion, Levine repeatedly expressed his dissatisfaction with the way the investigation had been conducted during the course of his testimony. The following colloquies during cross-examination are illustrative:

Q. And on the twenty-third, when you made the decision to get the defendants back to the United States, you had concluded in your own mind, that, because of all the problems, the mistrust, whatever it was, ... that you didn't think the deal would ever work out to where your pilots could go down and pick up the drugs, take them out of the country, and then have the defendants pick up the money; isn't that correct?

[Levine]: My decision was made based on the fact that the government in the running of the case, had so screwed it up, that I didn't think we could continue looking like drug dealers....

Transcript of Proceedings from February 15, 1989 at 2814–2815.

Q. ... In fact, you questioned what logic they [supervising agents and the U.S. Attorney] used, didn't you?

[Levine]: Oh, there were a lot of things I questioned about a lot of events and logic that occurred during those days, yes.

*Id.* at 2840.

Q. So then what you are saying, that different agents told you at different times contradictory statements ... ?

[Levine]: Sometimes the same agent would give me contradictory information. I—it was a mess.

Transcript of Proceedings from February 24, 1989 at 3463. In short, the Levine Memorandum would not have contradicted Agent Levine's testimony since he never misled the jury into thinking that he believed this to be an "ordinary undercover investigation."

The majority also errs in its assessment of the Memorandum's value for the purpose of impeaching Agent Robles. The Memorandum would have been useless for this purpose since there is no evidence that Robles shared Levine's belief that Wheeler was lying about his claims. Indeed, much

of Levine's dissatisfaction with the investigation stemmed from the fact that the Customs Agents, like Robles, did not share his dim view of Wheeler. I think the defense would get very little mileage out of attempting to impeach Robles through Levine's griping about Wheeler.

The majority next argues that there was a reasonable probability that appellants might have been acquitted had the defense been able to show that, in Levine's opinion, Wheeler had exercised too much control over the course of the investigation. While not having access to the details outlined in the Levine Memorandum, however, the appellants did in fact probe the degree of control Wheeler exercised during the course of the investigation. It was no secret to anyone at trial, least of all the jury, that Wheeler had exercised considerable influence over the conduct of the investigation, and had frequently operated undercover without the supervision or direction of government agents. The majority believes that the jury would have been swayed had it only known of Levine's complaint that Wheeler was utilizing Levine's "undercover identity to manipulate the case the way he (Wheeler) saw fit." Majority Opinion at 1459. But Levine in fact testified to the same effect at trial, noting that "Wheeler at different times spoke of things, arrangements, people, that I really wasn't aware of what he was talking about." Transcript of Proceedings from February 24, 1989 at 3418. A short while later, Levine noted that there were times during the investigation when he did not know what was going on because Wheeler "had the freedom in an undercover scenario to say and do whatever he as a drug dealer, an ex-drug dealer, deemed appropriate." *Id.* at 3426–3428; *see also id.* at 3456–3459 (Wheeler never told Levine that he had made requests of defendants on Levine's behalf). Levine concluded: "I did not control Mr. Wheeler at all." *Id.* at 3429. Indeed, the "insightful arguments" which the majority commends the defense for making at trial, *see* Majority Opinion at 1460, were really not so trenchant given that considerable evidence had been introduced to support those arguments, even

without access to the Levine Memorandum. I thus once again fail to see how the Levine Memorandum would have contributed anything substantial to the testimony already elicited by the defense at trial.

Finally, that majority seizes upon Levine's version of Wheeler's role in "thwarting" an attempt to record a phone call to General Poblano Silva in Mexico. I cannot agree with the majority, however, that this incident would have aided the appellants' in their efforts to show that their "claims to be acting on behalf of Mexican Army General Poblano Silva were totally false, and that in fact, no one from the Mexican military had actually promised to provide protection." Majority Opinion at 1462–63. The phone call as tape recorded provided absolutely no support for the government's case. Wheeler's act of "thwarting" the phone call the previous evening thus at best assisted the defendants by preventing the government from actually obtaining incriminating evidence. In any event, given the vast amount of evidence introduced against the defendants, I cannot believe that knowledge of this one episode would have persuaded the jury to draw the attenuated inference that Wheeler was aware of the defendants' "reverse sting" and was misleading the government agents to produce a conviction.

The evidence against the defendants was both voluminous and convincing; the potentially exculpatory portions of the Levine Memorandum sparse and amphibological. Appellants have found nothing more substantial than an ignis fatuus in the Levine Memorandum and, much to my surprise, the majority has chased it. Because I refuse to follow, I respectfully dissent.