Dwayne Earl BARTHOLOMEW,
Petitioner–Appellant,

v.

Tana WOOD, Superintendent of the
Washington State Penitentiary,
Respondent–Appellee.

No. 93–35549.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 8, 1994.

Decided Sept. 6, 1994.

witness on the issue of premeditation had failed a polygraph test. He contends that, if the prosecution had disclosed the information, he would likely have been convicted of simple rather than aggravated first-degree murder. Had Bartholomew been convicted of the lesser murder charge, he would, at an elderly age, become eligible for parole. Instead, because of the degree of his conviction, he is ineligible for release from prison at any time during his lifetime.

Because the state has admitted that it did not disclose the adverse results of the polygraph test administered to its key witness, and because that failure undermines confidence in Bartholomew's conviction of the aggravated offense, we reverse and order the district court to issue a writ directing the state either to grant Bartholomew a new trial on the question of premeditation or to reduce the degree of the conviction to simple first degree murder.

Timothy K. Ford, MacDonald, Hoague & Bayless, Seattle, WA, for petitioner-appellant.

Thornton Wilson, Asst. Atty. Gen., Olympia, WA, for respondent-appellee.

Before: WRIGHT, TANG, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Dwayne Bartholomew, a Washington State prisoner, was convicted of aggravated first degree murder. Although he was originally sentenced to death, the Washington Supreme Court reversed his sentence, and after a sentencing retrial he received a sentence of life without possibility of parole. Upon exhausting his remedies in the state courts, he brought this habeas corpus petition, which the district court denied. On appeal, Bartholomew claims that the state violated due process by failing to disclose that its crucial

## I.

On August 1, 1981, Dwayne Bartholomew robbed a Tacoma laundromat. During the course of the robbery, he fired two shots with a .22 caliber pistol. One bullet struck and killed the attendant, while the other was found lodged in a counter near the body. Bartholomew confessed to committing the robbery and to firing the fatal shot. He has never challenged the voluntariness or validity of this confession. At trial and on this appeal of the denial of his habeas petition, Bartholomew's claims have revolved around a single, narrow issue: whether he had the requisite mens rea to be convicted of aggravated first degree murder under Washington law (which requires premeditation), or whether he could only have been convicted of simple first degree murder (for which a felony-murder theory is sufficient).[1] Bartholomew asserts that he did not have the premeditated intent to kill the laundromat attendant.

The crucial witnesses against Dwayne Bartholomew were Dwayne's brother Rodney

---

1. Under Washington law, aggravated first degree murder is punished by death or by life imprisonment without possibility of parole. First degree murder is punished by life imprisonment *with* the possibility of parole.

and Rodney's girlfriend, Tracy Dormady (who was pregnant with Rodney's child at the time Dwayne committed the crime). Rodney and Tracy's testimony provided the only direct evidence that Dwayne had the premeditated intent to kill: they testified that he had told them he intended to rob the laundromat and leave no witnesses. Dwayne Bartholomew's defense centered on the assertion that Rodney had been involved in the robbery and that Rodney and Tracy were lying, out of self-interest, about the part of their testimony upon which the state relied to establish Dwayne's premeditation.

After the trial at which he was convicted and sentenced to death, Dwayne discovered that, at the request of the prosecution, Rodney and Tracy had submitted to polygraph examinations. The results of Tracy's test were inconclusive, but Rodney's suggested that he was untruthful when he gave negative answers to the two relevant questions: whether he in any way helped Dwayne to rob the laundromat, and whether he and Dwayne had at any point been inside the establishment at the same time on the night of the robbery. Although the state's attorney has asserted throughout the entire course of these proceedings that the prosecution maintained an open-file discovery policy, the existence of these examinations, and their results, had not been disclosed to the defense. Indeed, the prosecution initially denied that any tests took place.[2] However, it eventually conceded that the tests had indeed been administered and that the state had suppressed the results.

Dwayne Bartholomew moved for a new trial, in part on the basis of the newly-discovered polygraph results, but the trial court denied the motion. On appeal, the Washington Supreme Court affirmed Bartholomew's conviction. See State v. Bartholomew (Bartholomew I), 98 Wash.2d 173, 654 P.2d 1170 (1982). It rejected his claim that the state violated due process by failing to disclose Rodney's polygraph results. Although the court affirmed Bartholomew's conviction of aggravated first-degree murder,

it reversed his death sentence because it held that the Washington death penalty statute was unconstitutional as applied. It adopted a narrowing construction of the statute and remanded for a retrial of the penalty phase under the narrowed construction. The state sought review of this decision in the U.S. Supreme Court, which vacated the Washington Supreme Court's decision and remanded for reconsideration in light of Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). See Washington v. Bartholomew, 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383 (1983). On remand, the Washington Supreme Court adhered to its earlier decision and remanded for a penalty retrial. See State v. Bartholomew (Bartholomew II), 101 Wash.2d 631, 683 P.2d 1079 (1984). The Washington Supreme Court held that the polygraph results would be admissible on remand. See id. 683 P.2d at 1088–89.

After the decision in Bartholomew II, the county prosecutor determined that the evidence did not support a sentence of death under the narrowing construction adopted by the state Supreme Court. The prosecution and defense filed a joint motion for a sentence of life imprisonment without parole. Because the trial judge doubted that the prosecutor could decline to seek the death penalty at so late a stage of the proceedings, he appointed special counsel to argue that the state lacked discretion to do so. After hearing argument from both parties and the special counsel, the trial court denied the joint motion and ordered that a new sentencing hearing take place. The prosecution and defense appealed. In a six-to-three decision, the Washington Supreme Court held that "[t]he prosecution has no right, statutory or constitutional, to usurp the jury's functions to determine *mitigation* in this case, and make the decision whether the defendant should live or die." State v. Bartholomew (Bartholomew III), 104 Wash.2d 844, 710 P.2d 196, 200 (1985) (emphasis in original). Thus, the court remanded "with instructions that the prosecutor present this case to a sentencing

---

**2.** When Dwayne Bartholomew's new counsel first moved for a new trial, the prosecutor stated:

I can give an answer right now. There weren't any polygraphs and there wasn't any deal; so, so much for that.

(Trial Tr. 620).

jury for trial of the penalty phase of this case." *Id.*

The penalty retrial occurred in the fall of 1986. The defense offered the results of Rodney Bartholomew's polygraph test. It also challenged several other items of evidence that had been introduced at the original penalty trial. The jury returned a verdict of life imprisonment without parole, the more lenient of the two sentences it was free to impose.

After exhausting his state remedies, Bartholomew filed this federal habeas petition in the District Court for the Western District of Washington in 1991. Among other claims, the petitioner alleged that the state had violated due process by failing to disclose the polygraph results to the defense prior to trial of the guilt phase and that Bartholomew's trial counsel had been ineffective because he failed to discover that the polygraph tests had been conducted and he failed to undertake a sufficient investigation of the operation of the gun used in the robbery. After an evidentiary hearing, the district court denied the petition. It held that Bartholomew had failed to show that any errors on the part of his attorney prejudiced his defense. It also held that he had failed "to show that disclosure of the results of the polygraph to defense counsel would have had a reasonable likelihood of affecting the verdict." The district court granted a certificate of probable cause, and Bartholomew filed this appeal.

## II.

Bartholomew contends that the state violated the Due Process Clause when it failed to disclose that Rodney Bartholomew had failed the lie detector test. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The state concedes that it failed to disclose the test or its results, and there is little doubt that the results of the test were favorable to Dwayne Bartholomew. However, the state argues that the polygraph results were not material to the question of the degree of Bartholomew's guilt because polygraph results are generally inad-

missible under Washington law, and because Rodney and Tracy's testimony was not the only evidence tending to show premeditation. We reject these arguments. Having reviewed the state court record, we conclude that there was a reasonable probability that Bartholomew would have been convicted of simple instead of aggravated first degree murder if the polygraph results had been disclosed.[3]

In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. By its terms, *Brady*'s holding was limited to cases in which the defendant made a request for the suppressed evidence. However, the Supreme Court made clear in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), that the failure to disclose material and favorable evidence will violate due process even when the defendant makes no request for the material. Subsequently, in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court explained the meaning of the term "material." "[E]vidence is material," the Court said, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 S.Ct. at 3383 (plurality opinion); *accord id.* at 685, 105 S.Ct. at 3385–86 (White, J., concurring). As *Bagley* makes clear, a defendant need only demonstrate a reasonable probability that "the result of the proceeding would have been *different.*" To satisfy this standard, a defendant will not always have to show a reasonable probability that he would have been exonerated if the material had been disclosed. In a case such as the present one, it is sufficient to establish a reasonable likelihood that the *degree of conviction* would have been lower. *Cf. Hill*

---

**3.** Because we conclude that the writ must issue on the basis of the *Brady* violation, we need not reach Bartholomew's other claims.

*v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 371, 88 L.Ed.2d 203 (1985) (holding, in context of ineffective assistance challenge to a guilty plea, that a defendant need only show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial").

■ There is little doubt that the results of Rodney Bartholomew's polygraph test were favorable to the defense of Dwayne Bartholomew. If they were admissible, the information would clearly have been of substantial import. In *United States v. Brumel–Alvarez,* 991 F.2d 1452 (9th Cir.1993), we explained that *"Brady* information includes 'material . . . that bears on the credibility of a significant witness in the case.' " *Id.* at 1461 (quoting *United States v. Strifler,* 851 F.2d 1197, 1201 (9th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989)) (ellipsis in *Brumel–Alvarez* ). The polygraph results bore directly on the credibility of the most significant witnesses in the case, Rodney Bartholomew and Tracy Dormady. Rodney and Tracy provided the only direct evidence of premeditation—they stated that Dwayne announced that he intended to leave no witnesses to the robbery. Any facts that would provide a basis to impeach this statement were clearly favorable to Dwayne's defense.

Moreover, the polygraph results directly supported Dwayne's theory of the case: he claimed that Rodney had participated in the crime and was lying to protect himself, and that Tracy was lying to protect Rodney, the father of her child. Dwayne's attorney vigorously argued this theory to the jury, but he had no support for it other than Dwayne's obviously self-serving statement. Had Dwayne been able to introduce evidence of the polygraph tests, or even to use the results as a basis for further investigation, his attack on Rodney and Tracy's credibility would likely have been demonstrably stronger.

The state argues, however, that the polygraph results would not have been material even if they had been admissible, because Rodney's testimony was not the only evidence tending to show premeditation. We find this contention unpersuasive. The state first notes that at trial it offered the testimony of Tracy Dormady and of Stanley Bell, both of whom related statements of Dwayne's that indicated that he had intentionally shot the attendant. However, as explained above, the polygraph results would have served to impeach Tracy's testimony just as they would have Rodney's—if he had a motive to lie to protect himself, she had a motive to lie to protect him as well. As to Bell, he testified only at the *penalty* phase; his testimony could not have influenced the finding regarding premeditation made by the jury at the guilt phase, and that is the only finding regarding premeditation that occurred in this case.

■ The state also notes that it introduced evidence regarding the single-action design of the gun. At trial, the state argued that two volitional acts were necessary to cock and fire the gun. However, Dwayne's attorney presented a plausible theory that the gun went off accidentally. As a result, the significance of the gun design evidence was disputed. In any event, that evidence was not so persuasive that we can say that Rodney and Tracy's testimony was unimportant to the jury's decision. Their testimony constituted the *only direct* evidence of premeditation presented by the state at the guilt phase of the trial. The failure to disclose material which would have impeached Rodney and Tracy's credibility (or which would likely have led to evidence impeaching their credibility) necessarily undermines confidence in the outcome of the trial, even if circumstantial inferences from the design of the murder weapon would have been sufficient to support the verdict. The test is not whether there is sufficient other evidence to support a verdict, but whether we can be confident that the jury would have returned the same verdict had the *Brady* violation not occurred. *See Lindsey v. King,* 769 F.2d 1034, 1042–43 (5th Cir.1985) (holding that the failure to disclose evidence impeaching one of the two eyewitnesses caused sufficient prejudice to undermine confidence in the outcome, even though the other witness's testimony supported the verdict by itself).

■ The district court appears to have assumed that the polygraph results would have been material if they had been admissible.[4] The judge appears to have rested his denial of Bartholomew's petition on the state's argument that the polygraph results were not admissible under Washington law, and thus that they did not satisfy *Brady*'s materiality requirement.[5] As the district court noted, the Washington state courts have held that polygraph results are generally inadmissible even for impeachment purposes absent a stipulation of the parties. *See, e.g., State v. Ellison*, 36 Wash.App. 564, 676 P.2d 531, 535, *review denied*, 101 Wash.2d 1010 (1984). We need not, however, determine whether Dwayne Bartholomew could have introduced the polygraph results, for we conclude that the non-disclosed polygraph test satisfied *Brady*'s materiality requirement whether or not it was admissible. In *United States v. Kennedy*, 890 F.2d 1056 (9th Cir.1989), *cert. denied*, 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990), we stated that "[t]o be material under *Brady*, undisclosed information *or evidence acquired through that information* must be admissible." *Id.* at 1059 (emphasis added). The *Kennedy* court noted that "in determining the materiality of undisclosed information, a reviewing court may consider 'any adverse effect that the prosecutor's failure to respond might have had *on the preparation or presentation* of the defendant's case.'" *Id.* (quoting *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384) (emphasis added). The failure to disclose the polygraph results clearly impaired Dwayne Bartholomew's ability to prepare and present his case. Under all of the circumstances, that impairment was sufficient to undermine confidence in the outcome.

Dwayne Bartholomew's trial attorney conducted a minimal investigation of Rodney's credibility, doubtless because there appeared to be no evidence to corroborate Dwayne's account of Rodney's participation in the crime. Had counsel known of the polygraph results, he would have had a stronger reason to pursue an investigation of Rodney's story. He likely would have attempted to interview Rodney and Tracy before trial. He likely would have taken Rodney's deposition and probably Tracy's, as he was entitled to do under the state criminal rules. *See* Wash.Super.Ct.Crim.R. 4.6(a); Habeas Tr. 67.

At a deposition, Dwayne's counsel could have asked Rodney about the polygraph results and might well have succeeded in obtaining an admission that he was lying about his participation in the crime and about his brother's actions on the night in question. Such an acknowledgment would have been admissible to impeach Rodney if Rodney gave inconsistent testimony at trial. Even if counsel did not succeed in provoking so damaging a response, any thorough questioning at the time of deposition would likely have elicited a variety of less crucial statements inconsistent with Rodney's trial testimony. Indeed, after the trial was over and Dwayne discovered the polygraph test, Rodney related at least two contradictory accounts regarding the number of times he sat for the polygraph examination. Immediately after the first trial, Rodney told one of Dwayne's attorneys that "[h]e was told there was a problem with the results on two questions and asked to come back for additional examination. Rodney indicated that he did not return for any additional examination." Tufts Affidavit at 1. In the district court, however, Rodney stated that he *did* come back for a second test, and that he was under the influence of drugs at the time of the first test. *See* Habeas Tr. 86. These inconsistencies demonstrate that a vigorous examination of Rodney Bartholomew in a pretrial deposi-

---

**4.** In a very similar case, the Third Circuit held that the failure to disclose the oral reports of a polygraph examiner created a reasonable likelihood that the outcome of the proceeding would have been different, where these reports cast doubt on the credibility of a key prosecution witness. *See Carter v. Rafferty*, 826 F.2d 1299, 1309 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988).

**5.** The district court stated:

The petitioner also presents persuasive argument and evidence that the prosecutor should have advised defense counsel of the results of the witnesses' polygraph tests. Petitioner fails, however, to show that *evidence* was withheld. *The information withheld only possibly could have led to some admissible evidence.* He fails to show that disclosure of the results of the polygraph to defense counsel would have had a reasonable likelihood of affecting the verdict. (emphasis in original).

tion would likely have uncovered a variety of conflicting statements which could have been used quite effectively in cross-examination at trial. In a close case such as this, the *Brady* violation could well have made the difference.

### III.

Given the closeness of the issue of premeditation, the likelihood that disclosure of the polygraph results would have led to other admissible evidence undermining Rodney Bartholomew's and Tracy Dormady's credibility creates a reasonable probability that the jury would have convicted Dwayne Bartholomew of simple rather than aggravated first degree murder had the state disclosed those results. Because the prosecution's failure to disclose that information undermines confidence in the verdict, we conclude that the state violated the Due Process Clause. Accordingly, we reverse.[6] The district court is instructed to issue an alternative writ ordering the state to afford Bartholomew a new trial on the issue of premeditation within a reasonable period of time or to reduce his degree of conviction to simple first degree murder.

REVERSED.

---

6. Because we have concluded that the polygraph results were "material"—that is, that their suppression caused prejudice to the defense—it necessarily follows that the prosecution's failure to disclose this information " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).